Filed 3/29/23  In re A.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E079906 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ112306) |
| v. | OPINION |
| T.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge.

Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

A juvenile court terminated the parental rights of defendant and appellant T.S. (mother) as to her daughter, A.S. (the child). On appeal, mother contends the court erred by finding the beneficial parental relationship exception to termination of parental rights did not apply. (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i).) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 4, 2020, the Riverside County Department of Public Social Services (DPSS) received an immediate response referral with allegations of general neglect. The social worker responded to a restaurant parking lot, where she observed mother sitting, holding the child. The police were present and advised the social worker that mother appeared to be under the influence and homeless. She had been smoking methamphetamine in her car, with the child sleeping in the back seat. The social worker observed the child to be wearing what appeared to be pajamas with no underwear, socks, or shoes, and her arms, legs, and feet were exposed to the cold weather. Mother displayed behavior consistent with someone under the influence of methamphetamine, including rocking back and forth, and moving her jaw back and forth excessively; her eyes were moving back and forth rapidly, while she was opening and closing them. The child told the social worker she was cold and hungry and asked if the social worker had any food to eat. The child told the social worker she "sleeps in her mom's car." The social worker observed that mother's car was cluttered with clothing, trash, and bags

---

[1] All further statutory references will be to the Welfare and Institutions Code section unless otherwise indicated.

from fast food restaurants, and there was alcohol, a methamphetamine pipe, and a jagged-edged machete inside of it.

On December 8, 2020, DPSS filed a section 300 petition on behalf of the child, who was four years old at the time. The petition alleged that she came within section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The petition included allegations that mother had an unresolved history of substance abuse, lived a transient lifestyle, and endangered the child's safety in that the child was found residing in a car with an illegal weapon, drugs, and drug paraphernalia within her reach. Mother was arrested for possession of drug paraphernalia, an illegal weapon, and child endangerment. The petition further alleged that the exact identity and whereabouts of the child's father were unknown. A first amended petition was subsequently filed, which deleted the portion alleging that mother was arrested for possession of an illegal weapon and child endangerment.

The court held a detention hearing on December 9, 2020, and detained the child in foster care. The court ordered supervised, in-person visitation to be at a minimum of twice a week for one hour each. At that time, due to COVID concerns, the court authorized electronic visits as well.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on January 4, 2021, and recommended that the court sustain the petition, declare the child a dependent, and order reunification services to be provided. The social worker reported that mother's son, Aj.S., was detained from her in 2006 and placed in protective care after DPSS received a

3

referral stating that mother dropped him off at a friend's house and fled.  It was also alleged that mother was using methamphetamine.  The court found allegations of general neglect true and eventually returned Aj.S. to mother under a plan of family maintenance. The social worker further reported that mother was arrested in September 2020 for transporting a child under the age of eight without using a child passenger restraint system.[2]

The social worker reported that mother wanted the child to be placed with the maternal aunt, J.S. (the maternal aunt), with whom mother's son Aj.S. was residing.  On December 20, 2020, a Relative Family Approval (RFA) referral was submitted on the maternal aunt's behalf.

As to visitation, the social worker reported that at the detention hearing the court ordered in-person visitation and electronic visitation, to be supervised by DPSS or an adult approved by DPSS.  During the month of December 2020, due to COVID, mother had phone and/or Skype visits with the child, which lasted 12-15 minutes each.  During a call on December 22, 2020, mother appeared to be heavily under the influence.  Her speech was slurred, and she was unable to have a meaningful conversation.  She was nodding off, closing her eyes, and constantly moving her head side to side.  Mother kept wiping her nose and could not sit still, so the video visit was ended.  During the month of January 2021, mother had three video call visits that went well.  She and the child talked for 20 minutes during each call, and mother was actively engaged.  On January 19, 2021,

---

[2] The report does not state the disposition of that case.

they had an in-person visit that reportedly went well until the end, when the child became upset and wanted to leave early because she was hungry. They had three other in-person visits in January that were positive. Mother and the child hugged each other, talked, and played; the child cried at the end of two of them, and mother comforted her.

The social worker noted her concern that mother had not enrolled in any services. Mother was offered outpatient substance abuse services but declined because she wanted inpatient services. She was also offered enrollment in the Intensive Family Preservation court program but refused it.

The court held a contested jurisdiction hearing on February 3, 2021. County counsel informed the court that it had submitted a second amended petition for filing that day.[3] The court ordered the second amended petition to be filed, sustained the amended petition, adjudged the child a dependent, and removed her from mother's custody. The court ordered mother to participate in reunification services and ordered the prior visitation orders to remain in place. It authorized liberalized visits, to include unsupervised, overnight, and weekend visits.

*Six-month Status Review*

The social worker filed a six-month status review report on July 14, 2021, recommending that mother's services be continued. The social worker reported that mother was unemployed and homeless, but she maintained communication with DPSS.

---

[3] The second amended petition essentially just deleted the words "chronic and unresolved" from its description of mother's history of substance abuse and "an illegal weapon, and child endangerment" from its description of mother's arrest.

On May 11, 2021, mother said she was entering a sober living facility. The facility confirmed she was living there and could stay up to 18 months. However, mother left the facility on May 26, 2021, but declined to say why. The social worker further reported that the maternal aunt was approved by RFA, and the child was placed in her home on April 16, 2021. The maternal aunt was providing a stable living environment, and the child was thriving in her care.

The social worker further stated that during this reporting period, mother had been generally consistent in visiting the child. The supervised visits took place twice a week for two hours at the DPSS office and were described as appropriate. The child was affectionate toward mother and appeared to be bonded with her. Mother also called and video chatted daily.

The court held a contested six-month review hearing on August 3, 2021, and continued mother's services.

*Twelve-month Status Review*

The social worker filed a 12-month status review report on January 11, 2022, recommending the court continue reunification services. As to visitation, the social worker reported that mother was having consistent weekly supervised visits with the child at the beginning of this reporting period. However, mother entered an inpatient substance abuse treatment program on September 30, 2021, and since that time had not had consistent in-person visitation; at first, it was due to not wanting to have her daughter visit her at the facility, and later it was due to scheduling issues. Mother was currently having in-person visits one to two times a month, with the last visit being on December

18, 2021. She was consistently having supervised video visits several times a week, and sometimes every day. No concerns were reported.

The social worker stated that out-of-home placement remained in the best interest of the child, as mother was still addressing her substance abuse issue and needed to obtain stable, safe housing. The social worker stated that mother was only minimally participating in her substance abuse program and continued to resist individual therapy.

The court held a 12-month status review hearing on January 26, 2022. It followed the social worker's recommendation and continued reunification services. It also maintained the current visitation orders.

*Eighteen-month Status Review*

The social worker filed an 18-month status review report on April 28, 2022, and recommended that the court terminate mother's services and set a section 366.26 hearing. The social worker reported that mother was now renting a room in an apartment. She also reported that mother tested positive for methamphetamine on March 15, 2022. The social worker opined that out-of-home placement remained in the child's best interest since mother failed to resolve the issue that led to the removal of the child. Mother completed an inpatient substance abuse program and parenting program, but apparently had failed to benefit from them. She also refused to participate in any aftercare or outpatient substance abuse services.

The child continued to thrive in the maternal aunt's home and liked living there with her cousins and brother. As to visitation, the social worker reported that mother had consistent weekly, supervised visits, as well as phone calls, throughout this review

7

period.  The visits took place at the maternal aunt's home or in the community.  The maternal aunt supervised the visits and reported that mother was appropriate.  The child enjoyed visiting with mother and liked that the visits took place at the maternal aunt's home.

The court held a contested 18-month review hearing on May 26, 2022, and county counsel asked the court to set a section 366.26 hearing and reduce mother's visits to twice a month.  The court stated it had no evidence of mother's sobriety and decided to follow DPSS's recommendation.  The court found mother had failed to make substantive progress in her case plan and terminated her services.  The court found that mother was visiting regularly, and the visits went well; thus, it maintained the current visitation order.  It then set a section 366.26 hearing.

*Section 366.26 Hearing*

The social worker filed a section 366.26 report on September 13, 2022, recommending that parental rights be terminated with adoption as the permanent plan, and it submitted a preliminary adoption assessment.  The social worker reported that mother had been having consistent weekly visitation with the child throughout the case, and the visits were generally appropriate.  However, the maternal aunt further reported that, during this review period, mother had been inconsistent with her visits.  Mother would promise the child she would visit, and then would not schedule visits.  The maternal aunt said this was hard on the child, as evidenced by her crying and saying she missed her mother.  The maternal aunt did report that there had been moments after visits where the child exhibited signs of incontinence, and she theorized this was a stress-

8

induced behavior. The maternal aunt would shower the child with positive attention and praise, which appeared to help her transition back from visits with mother.

The social worker reported that the child had been living with the maternal aunt since April 16, 2021, was thriving in the home and was bonded with her. The maternal aunt had been in the child's life since birth. Although the child knew she was not her biological mother, the child would call her "mom" from time to time. The child felt safe living in her home, and when asked about her "forever home," the child said it was with her relatives and prospective adoptive mother. While the child was under the impression she would be living with mother soon, she said she "was good" with staying in the maternal aunt's home. The maternal aunt was committed to caring for the child for the rest of her life, and she understood her responsibility to provide a safe and loving environment, as well as her legal and financial responsibilities that came with adoption.

The court held a section 366.26 hearing on September 29, 2022. Mother's counsel objected to the plan of adoption and called mother as a witness. Mother testified that she would set up visits with the child by talking to her sister and seeing when was a good time for both of them. Mother said she usually had visits with the child at her mother's house, and they would play, talk, read, watch television, or "just whatever." When asked if she had seen the child on a weekly basis during the past six or seven months, and how she would characterize the number of visits, mother responded, "I don't see her enough due to my sister's schedule." Mother testified that she last saw the child the prior day, and before that, a couple of weeks ago. Mother said she had ongoing contact with the child. When asked if there was a time she was having regular visits in the last six

9

months, she said yes. She was then asked, "Going back to last year at Christmas time, were you seeing your daughter," and she said, "Off and on, yes." Mother added that it was just a matter of arranging visits between her and her sister. Mother said there was a very strong bond between her and the child, and the child saw her as her mother.

Counsel gave closing arguments and mother's counsel argued that the beneficial parental exception applied. He argued that mother had visited the child, then stated, "There may have been some inconsistencies. But, again, the child is with a relative." He then asserted that, "for the most part" mother was visiting on a consistent basis. Counsel further asserted that there was a bond between mother and daughter, and the child called her "mom." County counsel argued the record did indicate that mother was having consistent visitation; however, after her services were terminated, the visits were not consistent. Mother would promise to visit, and then not follow through. County counsel further argued that, although mother loved the child, it would not be detrimental to terminate parental rights. Counsel for the child agreed with the social worker's recommendation to terminate parental rights and allow adoption to occur.

The court recognized that, at one point, there was regular visitation and that mother testified she saw the child the day prior to the current hearing; however, before that, she saw the child two weeks ago. The court noted that prior to that, mother was not able to "give a concrete answer as to [a] visitation schedule, or how often." The court stated that when asked about Christmas time last year, mother indicated visitation "was on and off." Thus, the court found there was no regular visitation. It further noted that the child was thriving in her current placement and that while she recognized the

10

parent/child relationship with mother, the child was also attached to the maternal aunt. The court found the maternal aunt "fill[ed] a parental role." It concluded that, "for the reasons stated in the report, as well as the reasons given on the record," the beneficial parental relationship exception did not apply. The court then terminated parental rights and found that adoption was in the best interest of the child.

DISCUSSION

The Beneficial Parental Relationship Exception Did Not Apply

Mother contends the court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). She specifically argues that she consistently visited the child throughout the life of the case. Mother also claims the court improperly considered the parental role she and the maternal aunt occupied and, as a result, failed to properly consider if the child would benefit from continuing her relationship with mother and if terminating the relationship would be detrimental. We conclude the court properly found the exception did not apply.

A. *Relevant Law*

At a section 366.26 hearing, the juvenile court selects a permanent plan for the dependent child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296; § 366.26, subd. (b)(1)-(7).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) A permanent plan of adoption necessarily involves termination of the biological parents' parental rights to the child. (*Id*. at p. 574.)

11

In selecting a permanent plan for the child, the court is first required to determine whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If the court finds, based on clear and convincing evidence, that the child is likely to be adopted, and if there has been a previous court determination, by a preponderance of the evidence, that it would be detrimental to the child to return the child to his or her parent or guardian (§§ 366.21, 366.22), then the court is required to terminate parental rights and select adoption as the child's permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under at least one of several statutory exceptions to the adoption preference. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249; § 366.26, subd. (c)(1)(B)(i)-(vi).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The parental-benefit exception applies where the court finds a "compelling reason" for determining that termination of parental rights would be detrimental to the child because, in the words of the statute, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Our Supreme Court recently clarified the proper application of the parental-benefit exception and, in doing so, discerned "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) As

12

*Caden C.* indicates, the second and third elements of the exception are inextricably connected.

The *Autumn H.* court recognized this connection when it interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child *to such a degree as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, 27 Cal.App.4th at p. 575, italics added.)

We review the juvenile court's findings on the first two elements of the parental-benefit exception for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) "The determination that the parent has visited and maintained contact with the child . . . is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Ibid.*) The third element—whether termination of parental rights would be detrimental to the child—is "somewhat different" in that it requires the court to "assess[] what the child's life would be like in an adoptive home without the parent in his life." (*Id.* at p. 640.) "The court makes the assessment by weighing the harm [to the child] of losing the relationship against the benefits [to the child] of placement in a new, adoptive home.

13

And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with the parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

A court abuses its discretion only when it " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) A reviewing court should find an abuse of discretion, "only ' "if " ' " it finds that no judge could reasonably have made the decision that the judge did when all of the evidence is viewed most favorably in support of the judge's decision. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

B. *Mother Did Not Maintain Regular Visitation and Contact*

As to the first element, "[t]he question is just whether 'parents visit consistently,' " and is essentially a factual determination. (*Caden C.*, *supra*, 11 Cal.5th at p. 632, 640.) The court here found that mother did not maintain regular visitation and contact with the child, and substantial evidence supports this determination. The social worker acknowledged that mother was having consistent weekly visitation with the child throughout the case, and the visits were generally appropriate. However, when mother entered an inpatient substance abuse treatment program on September 30, 2021, she stopped having consistent in-person visitation. At first, it was due to her not wanting to have the child visit her at the facility, and later it was due to scheduling issues. The social worker reported that mother was only having in-person visits once or twice a

14

month, although the court ordered her to have in-person visits twice a week, at a minimum.[4]

Furthermore, during the period from May 2022 to September 2022, the maternal aunt reported that mother "has been inconsistent with her visitations. The mother has been promising [the child] she is going to visit, and then will not schedule to meet." Additionally, at the section 366.26 hearing, mother testified that she saw the child the day before the hearing, but prior to that, it had been a couple of weeks. When asked how she would characterize the number of visits she had with the child in the past six or seven months, mother said, "I don't see her enough . . . ." Although mother blamed her sister's schedule, we again note the maternal aunt said the visits were inconsistent because mother would promise to visit and then would fail to schedule visits. Moreover, when asked if she was visiting the child at Christmas time in 2021, mother said, "[o]ff and on," which indicates the visits were not consistent.[5]

Therefore, substantial evidence supports the court's finding that mother had not maintained consistent visitation and contact with the child.

---

[4] The social worker also reported that mother was having consistent video visits with the child; however, we note this regular contact apparently took place only through the 18-month review period. After that, there is no evidence of video visits.

[5] Notably, at the section 366.26 hearing, mother's counsel acknowledged that "[t]here may have been some inconsistencies" and stated that "for the most part" mother was visiting on a consistent basis.

C. *The Child Would Benefit from Continuing the Relationship*

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal. 5th at p. 632.) When analyzing this element, courts look to "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*)

We observe the court did not make any express findings with respect to the second element. However, we will assume the child derived some benefit from the relationship since she spent the majority of her life in mother's care, and, after removal, they had positive visits where they hugged each other, talked, and played, and the child cried at the end of some visits. The record also reflects that for some time, mother video chatted daily with the child, and the child appeared to be bonded with her. Thus, it appears they had positive interactions from which the child derived some benefit. (See *Caden C.*, *supra*, 11 Cal. 5th at p. 632.)

D. *Termination of Mother's Parental Rights Would Not Be Detrimental to the Child*

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) In other words, courts need to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Mother has not proffered

16

any evidence to support a finding that she had a "substantial, positive emotional attachment [with the child] such that the child would be greatly harmed" if the relationship was severed. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) She merely states that she "occupied and maintained a parental role in [the child's] life" and concludes that she satisfied the third element.[6] To the contrary, the evidence showed the child would *not* be greatly harmed if the relationship was severed. The adoption assessment report stated that, while the child was under the impression she would be living with mother soon, the child said she would "be good" with staying with the maternal aunt. The child said she felt safe in that home, and when asked about her forever home, she said it was with the maternal aunt. Thus, there was evidently no substantial, emotional attachment between mother and the child.

Mother claims the court "appl[ied] the wrong legal standard when evaluating whether [she] filled a parental role in the eyes of [the child]." She contends the court erred "[b]y considering the bond and parental role of the prospective adoptive parent" and asserts that the child's relationship with the caregiver was not relevant to the third

---

[6] We agree with this court's statement in *In re L.A.-O.* (2021) 73 Cal.App.5th 197 regarding the preferred practice of not using the term "parental role" in dealing with the parental benefit exception. There we said, "*Caden C.* did not use the words 'parental role' in its analysis. In fact, our Supreme Court has never formulated the parental-benefit exception in terms of a 'parental role.' [¶] *Caden C.* cautioned that 'rarely do "[p]arent-child relationships" conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary—even if it were possible—to calibrate a precise "quantitative measurement of the specific amount of 'comfort, nourishment or physical care' [the parent] provided during [his or] her weekly visits." [Citation.]' " (*Id*. at p. 210.) *In re L.A.-O* stated that "because 'parental role,' standing alone, is ambiguous—we think it is better not to use the words 'parental role' at all. After all, *Caden C.* managed to describe and discuss the parental-benefit exception without using them." (*Id*. at p. 211.)

17

element.  The court here noted the child was thriving in her current placement and that while she recognized the parent/child relationship with mother, the child was also attached to the maternal aunt.  The court further noted the maternal aunt "fill[ed] a parental role."  Contrary to mother's claim that the court "applied the wrong legal standard," the record indicates the court properly considered the security and stability the maternal aunt was providing for the child in her home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  Moreover, the evidence showed the child was bonded with the maternal aunt.  By the time of the section 366.26 hearing, she had lived with her for over 17 months, and they had a mutual attachment.  The maternal aunt was meeting all her needs and was committed to raising her to adulthood.  The social worker reported that the child was happy living with the maternal aunt, felt safe in her home, and said she would "be good" with staying there permanently.

Ultimately, mother failed to meet her burden of showing that the child had a substantial, emotional attachment to her such that the child would benefit from continuing the relationship, or that terminating the relationship would be detrimental to the child when balanced against the benefit of an adoptive home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  We see no abuse of discretion by the juvenile court in this determination of the final *Caden C.* element of the exception.  Therefore, the court properly declined to apply the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i).

DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

CODRINGTON _____
Acting P. J.

MENETREZ _____
J.

19